on behalf of Joshua Cruz and pursuant to the court's order, I will be addressing the first request dealing with the dual role of Agent Pitkowski. After that, my colleague Mr. Lemesh will deal with the Gonzalo Gallego's proper report. After that, my colleague Ms. Fiorio will deal with the Abarco motion to continue. And after that, Ms. Feldman would like a couple of minutes to address some issues that she feels are important. And if the court will not give us additional time for purposes of rebuttal, then we would like to reserve the balance of the time for purposes of rebuttal. You may proceed and we'll see if we need additional time. Thank you. With respect to the first issue that the court had indicated he wanted us to address, Agent Pitkowski was clearly an individual that the government wanted to have the jury hear from and basically present its case. At the outset of this case and prior to the trial, the defense moved to exclude Agent Pitkowski from the courtroom and also wanted to clarify what his role was going to be. The trial court overruled that objection and allowed basically Agent Pitkowski, as the case agent, to not only testify numerous times, and I'll get into that, but also to sit at counsel table with the government. So that day in and day out, as the jury entered the courtroom, they would go by Agent Pitkowski sitting at government table. As the trial began and continued, and as we've pointed out, Agent Pitkowski testified on 14 separate days. He testified 25 times, and he basically went back and forth in the role of perhaps 701, 702, lay expert, lay expert. And there were only three times that the trial court brought to the attention of the jury that this was occurring and clarified what his role should be. The problem here, of course, is that the trial court was made well aware of the dangers that are set forth in the Freeman case and also Dukagini, the problem of this blurring between lay and expert, especially when an individual is also designated as the case agent. And the situation where lay jurors are expected, in effect, to sort this out and be able to figure out what is going on when, in effect, the government is using this individual as a summary witness, is using this individual to, in effect, put forth their case, to underline their case, to exemplify those points that they want the jury to believe. And that's where the Freeman court and the Dukagini court warn. And with this district court, in the instant case, being well aware of what was going on and being well warned that this is a troublesome area to only, in effect, on just a couple of occasions, let the jury know that there was a problem there creates a major difficulty. What were the exact words that you let the jury know that there were a problem? Basically, just that the, in effect, that Agent Vitkowski is testifying now as a lay witness or Agent Vitkowski is now testifying as an expert witness. Nothing significant. Nothing to, in effect, create after each time he testified what his role was. And, of course... Was he asked to after each time? Was he asked to give it after each time? Was the district court judge? Yes. No. The district court judge was asked, in effect, to prevent this from occurring, both from keeping him out of the courtroom and also from having him recognized as an expert. But once the court made that decision, the court was certainly made aware of the court's obligation to make that warning. And I think that's the point, is that I don't think... So she called it to the jury's attention, sua sponte, on three occasions. And on other occasions, when she didn't, none of the defense lawyers asked her to do it. Your Honor, it's actually he... He, I'm sorry. And that's correct. But I think that it's not really sua sponte in that the defense warned the court. The court was well aware of its obligation. And so the court... Well, the defense, when they had this discussion, that they said, Well, Judge, if you're going to do this, we'd like you on each occasion to, when he lapses from one role into another, we'd like you to give the jury, you know, advise the jury of what's going on. I think that what the defense did was let the judge know, you are the gatekeeper here. And I think that's a word that is used in the case law. You are the individual who's in charge and responsible to make sure that this injustice does not occur. And once, in effect, you made the decision to allow this individual to sit at counsel's table, to testify both as an expert and a lay witness, you are responsible for, in effect, dealing with that situation and making sure that the jury is clear on what this person is talking about and what role this individual is playing at the moment and how the jury is supposed to deal with the evidence. Otherwise, as the case is cited, the jury is left with a situation where, in effect, this individual is unfairly acting as a guide, basically pointing the way that the prosecution wants it to, and, in effect, laying out the case the way the prosecution wants it to and being, in effect, a subject. Did you address this in his final charge to the jury? No. Was there a request forced for a charge? Quite frankly, I don't recall the specifics. I know that there were obviously requests during the trial to renew our objections to this, and I'm trying to think in terms of the general instructions that were given, and quite frankly, other than the typical Ninth Circuit jury instructions that deal with how to take witnesses and expert witnesses, I think those were the instructions that were given to the jury. In reading the questioning of Agent Vitkovsky, the prosecutors often phrased their questions saying, you know, in your experience or based on your involvement, didn't that serve to clarify for the jury on what basis the agent was giving an answer? Well, I think that the problem here is, and within my brief, I also addressed the expert witness problem, but the difficulty here is, all right, so in your experience, but to, in effect, say, unlike a typical expert where there's some type of scientific testing or acceptance in the community or a specific type of education, unlike those types of things that we're used to, none of that was true in this case. In effect, he was let loose to, in effect, say, you know, what he wanted to about the evidence. That's a different situation, and by doing that, he was, in effect, telling the jury his opinion, and it blurred. It really did. I mean, he was, in effect, letting the jury believe that he had some type of expertise and some type of special knowledge which had never been tested and had never been accepted in the community the way we look at other types of expert witnesses. So it was a different standard. It was a different type of situation, and I think that it warranted the court to take charge as the gatekeeper and make sure that that type of behavior did not go unchallenged. The judge is the one who is responsible for keeping control of the trial and ensuring that my client and the other clients get... That's always the case, but that doesn't mean that counsel is sort of relieved of the responsibility for, when the judge is not doing it, to ask for it. If you had asked for it, the judge might have given this instruction. I don't understand. You're not taking the position that absolutely this was prohibited per se. No. So then the prejudice could have been alleviated, what I understand you to be saying, by more frequent cautionary instructions, but that you never asked on occasions when the judge didn't give it, when it should have been given. You are relieved of your responsibility of making a request because you would initially voice the general objection to this testimony. Is that your position? Well, if we had done it one time, I'd agree, or even two times. But after a while, the cumulative effect, the court should be on notice that, in effect, we're objecting to this witness, that we're objecting to the terms of this witness. That I understand, but you just conceded that there was no per se... She was not obligated to prevent this from happening. He was obligated to take precautionary measures on three occasions. He did take precautionary measures on other occasions. He didn't, but there was no specific objection or request that a cautionary instruction be given. Is that right? It's basically correct, except the fact that there were 22 other occasions, and there were other objections, and so the court did have a responsibility. And in order to have a fair trial, the court really should have taken responsibility for this. And as a result of the number of times this occurred, I think it distinguishes itself from some of the other cases and says, this is not harmless error, this is, in effect, allowing a witness to function in a way... I'm looking at the questions whether it's plain error. I think that it is. I mean, again, if... It's a different test. Ducatini and Freeman, though, set forth the basis that the court should be aware of and had that opportunity. So is there any evidence that the jurors were, in fact, confused? Well, I mean, the... There is no opportunity, obviously, to pull... No, but I'm saying, I mean, could they send back a note or, you know, sort of... The one note they sent back had to do with the question about the RICO conspiracy issue. There's no way to unring the bell or know exactly the impact that this had, but it was pervasive, and it was... Did you argue these when you attacked his credibility in your summation? Did you make, for counsel, I don't mean you necessarily alone, make this point to the jury? Well, we did try to raise the point that this individual, in effect, was biased and that he was, in effect, a tool of this case. In other words, he was the case agent and he had these... He had every interest in seeing a conviction. Absolutely. And I would think that would be the absolute point you would make to the jury. And we did. We did make that point in argument. But, again, it's difficult for me to say what the jury actually decided it on because I'm not... I wasn't in the room and I didn't... They didn't share with me their thoughts. So you would say, you would argue for a principle that if the court doesn't monitor this sufficiently, then you would presume confusion by the jury just by the factual scenario? With the number of times that he testified and the number of days that he testified and with the record showing our continued objections from the beginning, before the jury began to hear evidence and throughout the trial. I think, yes, we would say that the facts of this case do warrant a finding that that was error and it wasn't harmless error. I think I need to let my colleagues address some of the other issues you wanted to hear from, and maybe I'll come back. So the Gonzales-Galegos proper report. Next. Good morning, Your Honor. Steve Glamish on behalf of Mr. Gonzales. I'll be spending my approximately five minutes to address the government's failure to release Mr. Gonzales' pretrial statement that was contained in the proper report. Basically, I only have two points. Number one, Rule 16, and all the cases following Rule 16, required the government to release this pretrial statement to the defendant, and it required the statement to be released pretrial. Second, once the government used the statement at trial, our position is that the intention of withholding of the statement violated Mr. Gonzales' right to fundamental fairness and the right to a fair trial. First, let's deal with the authority. Rule 16, basically, Rule 16, there are no arguments that Rule 16 doesn't mandate release of the defendant's statement, especially in a case like this. All the Ninth Circuit cases that allow the government to withhold the defendant's statement basically come in two contexts. One, either the statement is unsolicited or the statement is spontaneous. Doesn't it come down to whether or not Gonzales' statement was made in the course of an interrogation? It does, Your Honor. It does, Your Honor, and we're just about ready to address that. The only other circumstance in which the Ninth Circuit has held that the statement can be withdrawn is if the defendant doesn't know that he's speaking to government agents. So, the government's argument is that this wasn't an interrogation, that the proper session wasn't an interrogation. Basically, a proper session, at least in this case, was the government attorney, the government agents, multiple government agents, and local law enforcement officials gathering in the same room at the U.S. Attorney's Office waiting to question Mr. Gonzales on his knowledge of the Mexican Mafia. He appears without counsel in this proper session? He was with counsel, Your Honor, in another case. He was with counsel in a 1326 case. So, presumably, counsel would have been taking notes? Yes, and in the record. And presumably, Mr. Gonzales would know what he said? Absolutely. Presumably so. But the Ninth Circuit cases basically say that defense counsel can't always rely on the defendant. No, but there was another. He had a lawyer there who presumably was taking notes. That's why he had the lawyer there. He did have a lawyer. In recollection, the Second Circuit, if I'm not mistaken, has held that the lawyer must be there. Right. But so the lawyer is, in effect, taking notes about what was said. It's not just relying on the, I agree that you can't necessarily rely on the memory of the defendant as to what he may or may not have said, particularly if he wasn't telling the truth. Yes, Your Honor. The record is clear in this case that Mr. Gonzales had a lawyer, that the lawyer took notes. However, Mr. Gonzales' counsel in this case talked to the lawyer. This is also on the record. He talked to the lawyer, tried to get those notes from counsel. That counsel was in a capital case on appeal, and he could not find those notes. He couldn't find the notes. And that's on the record here in this case. This, United States v. Leonetti, this court said that these proper sessions are adversarial in nature and that they liken them to a police interrogation. And basically what the Leonetti court said was that the prosecutor is not transformed into an independent arm of government or independent or unbiased neutral arbitrator like, let's say, U.S. probation, U.S. probation interviews. They're not transformed into a neutral arm of the court just because a defendant expresses an interest in getting a lower sentence. Our second point is that the intention of withholding of this statement after the government used it, the statement at trial, deprived the defendant, deprived Mr. Gonzales of his fundamental fairness and his right to put on a defense. Basically, and... How exactly did they use it? First they used, first they attempted to use it by taking Mr. Gonzales' statement, asking the agent, did Mr. Gonzales make this statement? That was objected to and the judge stopped that. Then they went on to use the statement to rehabilitate Agent Petoskey on his expert opinion after cross-examination. But more grievous than that, then they threatened the defendant and said, Judge, we reserve the right to use this statement against Mr. Gonzales if his counsel or he present any evidence that contradicts the statement. That was the deal breaker in this case. That went over the line. And did you represent him at trial? Yes, I did. And did you say, we have somebody who's going to testify? Yes, we made an offer of proof to the court what this person would say, what we thought he would say, how it would contradict the agent, how it would contradict the government's theory that Mr. Gonzales had been involved in the murder, and how Mr. Gonzales was involved in extortion. And did the government say, well, if you do that, we're going to introduce the statement? No. The government stood by and said, we're not going to release the statement. We're not going to let you know what's in the statement. We want to keep you in the dark. For strategic reasons, we want to keep you in the dark and not let Mr. Gonzales remember what he said. So they didn't, they didn't, I just want to be sure exactly what they said. They didn't say, if you go ahead with this course of conduct, we are going to offer the statement. Right. What they, no, they didn't say that. What they said was, we're not going to tell you what's in the statement, but if you contradict it, we're going to offer the statement. But they didn't say your proffer was a contradiction of the statement. No, they didn't. I see I'm over my time. We would ask the court to remand the case back to the district court for a new trial and order the court to release it, have the government release that statement. And the alternative, we also ask for a release in this court that we be allowed to have the statement in order to supplement our agreement. Well, would it matter? If you, if I understand your argument, it wouldn't matter what was in the statement. It was that it had a chilling effect on your, or you were worried about putting it in the defense because it could possibly have. And they wouldn't tell you one, they didn't tell you one way or another whether it did. So it almost doesn't matter, does it, to your argument, what's in the statement? I can, I can see your Honor's point. I think that. I mean, if it doesn't matter, then we don't have to have, I'm just thinking out loud for myself. But theoretically, it could go back to the district court to find out whether this was all harmless. Right. I understand, I understand the court's point. And I think that in the first instance, it should be remanded, and in the second instance, I guess just as a criminal defense attorney, I just wanted to look at the statement and address the issues that if I find something in there, I think defense counsel. New issues, new issues. Well, it could be a new issue, sure. I think that, I think he had a right to the statement, he had a right to the statement pre-trial, during trial. No, but there's rights and there's prejudice. There's such a thing called harmless error. And when I, I just want to be sure I understand your argument. Your argument is, is that the prejudice that you suffered was that you were afraid to put, to call some witness or put in a particular theory of the defense because the government might come forward and say this is inconsistent with what he, they might use the statement that he gave at the procession. Right. Well, if that's your theory, I don't know that it matters what's in that document. I understand. I understand. Again, just as a defense counsel. You'd like to see everything. Yeah, as a defense counsel, you'd like to go through all the government's files. I mean, I understand that. Well, I'd like to go through those documents that should have been produced in the first instance to see if there's another reason that they should have been produced. And they produced some of these, some of that document, didn't they? They produced a paragraph. Did the district court review the statement under, in camera? Not that I know of. Not that I know of. It was ordered, it was, we asked it to be given to the court for the record under seal. It was given to the record under seal. Whether the court ever looked at it, I don't have any information on it. All right. Thank you. Thank you, Your Honors. Good morning. I'll try to be brief in my comments. My name is Deborah DiOrio, and I'm here to address the issue of the district court's failure to grant a continuance to Cesar Ibarca. I want to focus on the prejudice, but I do want to start by saying that in this case, almost immediately after the indictment, the arraignment on the indictment, this case became a death penalty case for Mr. Ibarca. And for the ensuing 10 to 11 months, the defense was almost single-mindedly focused on the mitigation package that was being presented to the Department of Justice in order to convince them not to go forward on the death penalty case. That determination was made by the Attorney General just six weeks before the jury trial in this case began. Four of those six weeks. Surely the mitigation, the time that was spent on mitigation, would necessarily have also involved the lawyer becoming totally familiar with the nature of the conduct in which he was, the client was engaged in what he did and didn't do. As Your Honor knows, only some of that is the focus of a mitigation package. And, in fact, the Supreme Court has been very, very clear that if the lawyer focuses overly on the guilt or any innocence without focusing on the mitigation, that that's reversible error. I know that, but I would think in a normal course he would want to do both. And I think that to some extent that that is true. However, as I... You wouldn't want to argue, for example, to the Attorney General or to the U.S. Attorney as you go up the line, is that there's some serious... there may be some serious questions as to the strength of your case and that you really want to go forward with a death penalty. Well, it's clear from the record in front of the District Court that the defense was extremely concerned about the character of Jubila Barragan, the murder victim, and that they were continuously, even after the decision was made by the Attorney General, complaining that their efforts to get the CDC files and to get the information about Mr. Barragan were fruitless, that they were not getting the information to which they were entitled. So perhaps in a perfect world, that would dovetail nicely. In this particular case, it did not. And the defense was very clear in its complaints and comments to the District Court that they did not have the information they felt they were entitled to. The second point, which I think is contained in the briefing, but I just want to reiterate, is that the lion's share... You can slow down. I'm sorry about that. Were you the lawyer in the trial? I was not, Your Honor. You were not? I was not. The lion's share of the work done by the lawyer below was the Capitol Counsel, who was then relieved and was not the counsel that tried the case. That counsel, the counsel that tried the case, her name was Deborah Torres-Reyes, she was involved in another trial for three of that six-week period after the death penalty decision was taken off the table. So she literally had three weeks after the Attorney General decided not to go for death of preparation time. But now the facts of this murder were pretty simple. I mean, it was a very discreet event involving a fairly small amount of time. What things required a lot of preparation? I think the greatest problem with the prejudice, which is probably where Your Honor is trying to focus me, is the fact that there was no cohesive theory of defense. The theory of defense, and again, it was not just a straightforward murder trial. It was a Mexican mafia trial. But the theory of defense kept shifting because trial counsel was not familiar with the evidence that was going to be introduced by the government. And part of that is due to the fact that the government released 2,000-plus pages of impeachment evidence, giglio evidence, and evidence about the cooperating witnesses 30 days prior to trial when trial counsel was involved in another trial in district court. Trial counsel wasn't present for the eliminate motions. She did not see the government's exhibits because she was in trial. She did not participate in some of the voir dire. And as a result of that, she at one point gave notice that the theory of defense was going to be self-defense. At another point, she stated that it was a personal vendetta. At no point during the trial, in the beginning part, in the government's case in chief, did she question any of the witnesses about, for example, the defendant, the victim's reputation for violence or his criminal record or the fact that in prison many times violent offenses occur over, for example, drug debts. Was her ultimate defense self-defense? Was the theory of defense self-defense? I'm reluctant to concede that was her ultimate defense because she did go back to the self-defense and ask the judge and say that that was going to be her defense. But no evidence was adduced of that other than a very brief testimony by her client in which she didn't even really claim self-defense in any cohesive fashion. From the outset, did she concede that Abarca was involved in the killing of Berrigan? In her opening statement before she knew of the witnesses that were going to, quite frankly, jam him up on the Mexican mafia testimony, she was clearly not familiar with them. She was saying to the court in the beginning stages of the trial, who is this Henry Lugo? I've never heard of Henry Lugo. The government responded, yeah, we gave you Henry Lugo 30 days before trial. You have him. But she didn't know who he was because she wasn't able to read that because she was in another trial. She said in her opening statement, don't worry about whether or not Mr. Abarca committed the murder. He committed the murder for personal reasons. Then she withdrew a self-defense submission that she had made. Then months went by. Then she reasserted the self-defense. But in that interim, as the government's witnesses were testifying, there was no cross-examination on any of the elements that one would need to prove to a jury that there was self-defense. There was no cross-examination as to whether or not there could have been another reason why this murder took place. Because, again, it wasn't a murder trial. It was a Mexican mafia trial. And she was not familiar with the evidence that was most potent against her client on behalf of the Mexican mafia, the cooperating witnesses. She seemed to have absolutely no idea that that evidence existed. And in fairness to her, she told the court over and over and over again, I'm not ready. I'm not prepared. I haven't read this. I wasn't doing the lion's share of this. I'm in another trial. Please sever. You've already severed three other defendants. Allow us to go forward. Allow us to be tried with that group, and we'll be ready. And the district court did not do that. The district court did not get the other district court judge to stop that other trial or continue that other trial. Instead, the district court, knowing she was in another trial, knowing she was unprepared, seeing that she wasn't present at the proceedings, and being informed by her, I can't give this man the defense that he needs to get, did nothing other than say, we have a firm trial date, and that's the trial date that we set, and therefore you have to go forward. And I believe that the type of defense that was mounted for Mr. Abarca, the lack of a theory of defense that was cohesive, the lack of the cross-examination, the lack of putting forward the evidence and introducing evidence throughout clearly prejudiced him, and that this is not the type of defense that should be countenanced when someone is on trial and facing life without the possibility of parole. It's simply not acceptable. All right. Thank you, counsel. Are you Mr. Fernandez's counsel? Yes, Your Honor. Okay. So they're over time, but I'll give you a couple of minutes to address which specific issue are you interested in addressing. Your Honor, may it please the Court, over the settlement on behalf of George Fernandez, as argued in our brief, the government has failed to prove that the appellant here engaged in racketeering, especially with respect to the certain overt acts that were tried to be proven, specifically with respect to the narcotics charge. There were two sales that were made, one on September 9th and one on September 28th, to a boyfriend of the sister of the defendant. There was no evidence that the sales were intended to further the enterprise, were involved in the conspiracy. There was no indication that any money was forwarded to the Mexican Mafia by this defendant for those particular sales, which would have been, if they were intended to be in furtherance of the enterprise, there would have been a tax that was liable to be paid by Mr. Fernandez that wasn't paid. And certainly, there was no conspiracy with the confidential informant on DeSears v. United States and its progeny. With respect to the murder of Elvira Hernandez, Mr. Hernandez was shot and killed on July 28th, 2006. The only evidence that ties this particular defendant to the murder were some phone contacts that were made between a phone number that was subscribed to one of the members of the Mafia, a man by the name of Jose Navarez, and who gave the telephone to another co-defendant, Co-Defendant Cruz. There were two phone calls that were made to Mr. Fernandez early on the morning of the murder, but there's no indication as to the content of those phone calls, the purpose of those phone calls, and whether he even was the person who received those phone calls. So the evidence that was proffered by the government, in our estimation, proved nothing, and therefore, as a result, that part of the conviction should be reversed. I would not take any more time away from my co-counsel, and thank you very much. Thank you very much. Good morning, Your Honors. Todd Robinson on behalf of the United States in this proceeding. I'd like to address the last point that was brought up with respect to Defendant Fernandez and the government's lack of proof, just because that's fresh in my mind. The argument was just proffered to this Court that the government failed to prove his involvement in the murder of Alvaro Fernandez in San Diego, California, by anything other than telephone tolls. The record belies that contention. In fact, during an intercepted letter, which appears in the government's supplemental excerpts of records at 1954 through 1956, Fernandez says to another maid member of the Mexican Mafia, quote, I sent a drunk driver to sober up for the relatives, and that was a favor for Thomas. In the interpretation of that particular coded communication, the drunk driver in this case was the victim of the homicide, and when he was sent to sober up for the relatives, that's a communication that this murder was committed on behalf of the Mexican Mafia. And the fact that it was done on behalf of Thomas, Thomas Durkin, as you're well aware, is one of the appellants in this case and was one of the seven trial defendants in this case. And I could go through the record with numerous other examples to include the fact that during the two narcotic sales referenced by counsel for Mr. Fernandez, her client went on and on and on about his involvement in the Mexican Mafia, his desire to become a maid member of the Mexican Mafia, the fact that he had committed numerous 187s, that is, murders on behalf of the Mexican Mafia, and indeed the only reason, according to her client, that he was not a maid member of the Mexican Mafia is because the books had been closed while he was seeking admission into that organization, and the books being closed being a reference to the fact that they were not accepting any new members at the time he was seeking to gain entry into that organization. So the representation being made to this court that there was insufficient evidence is simply belied by the record in this particular case. Going back to the first issue that was addressed by my colleagues, that is, the dual role testimony, especially since it's Toschi, going back to the Freeman case, there is no per se rule against this type of testimony. That is, the dual purpose testimony where one witness testifies both in an expert capacity and under 701 as a lay witness. It was argued to this court that Agent Toschi repeatedly gave his opinion. He did. The defense contention in this case is not that the government elicited improper testimony. At its heart, the contention is this testimony was way too effective because it convinced this jury of the guilt of their claims. But the argument is that it was effective in a way that our court has frowned upon in Freeman and in the other case, in that allowing this dual role in Agent Toschi's case, triple role testimony, confuses the jury, causes them to overweight the expert, you know, take the expert to influence the recipient. And in fact, I think there were a couple instances cited by the defense where it was unclear whether an answer he gave was based on his investigation of the case versus his lay opinion as to the connections among the people versus his expert opinion based on his experience. I fully understand that that's the argument being advanced by the defendants in this case. So it's not that he's too effective. The other argument I have is that the jury believed some of his testimony that maybe they should have, you know, regarded as perhaps born out of self-interest in seeing the case he investigated result in a conviction and that they're not able to separately evaluate all of that testimony the way that they should. I understand that argument. But unfortunately for the defendants, there is no evidence in the record to support that contention. And the direct question was asked to my colleague, Mr. Landon, were there instructions given by the district court to this jury? And he said, yes, on three occasions. And I wrote down what he said. It was nothing significant. Quite to the contrary, there are four pages of the transcript in this case where the district court went into great detail as to the manner in which the jury should evaluate this type of testimony and went through categorically what a lay witness was, what an expert witness was. And I would direct the court to, I can read it into the record, it's the only excerpt of record I brought with me, but I would take up ten minutes of my time because it was that much of a detailed instruction. But for the record, it appears as supplemental excerpt of record at page 876 to 879. And that's the first admonition that the district court gave the jury in this case when evaluating this type of credibility and this type of testimony of Agent Petoskey. And there were other dual-role witnesses. There was Agent Flood who was also a dual-role witness. And the court also gave that admonition with respect to Wasn't Olive Flood's testimony about tattoos stricken? It was not stricken, no. It wasn't stricken? No, it was not. When you questioned him, did you regularly say, as an expert, do you have this opinion? Or as a recipient, do you have this opinion? Did you use that formula? I just haven't heard a view of the record, so I ask you what you represent as having done. And the reason why the Freeman concerns are not applicable to this particular case is one of the issues that Your Honor just raised, in that every time Agent Petoskey was asked to render an expert opinion under Rule 702, the question was phrased, Special Agent Vitcotti So you can tell us that on the record. It was always phrased that way where it was an expert opinion. There may have been, over this three- to four-month trial, one or two occasions when But in general? Absolutely. All right, that's awesome. And the court noted that. The court noted that the government parsed its questions of Agent Petoskey to address the concerns articulated by the court in Freeman. And so not only did we have the district court engaged in a vigilant gatekeeping function, as recognized by the court in Freeman, where he continually gave instructions, sua sponte, and would have, given his willingness to give them sua sponte, had he been requested by the defense to give additional instructions. We also had a situation where the testimony was made clear to the jury, Special Agent Petoskey, based upon your expertise, your expert opinion, what is the meaning of this coded communication. And that type of testimony is necessary in this type of case. We have letters from one co-conspirator to another that's addressed to I referenced one when I was going into the sufficiency of the evidence against Fernandez, where he said, I sent the drunk drivers to sober up for the relatives. That's a coded communication subject to 702 testimony, drunk drivers sobering up for the relatives. But then he says, I did it for Thomas. There has to be a government witness who will address who Thomas is, based on his participation in the investigation, and that is 701 testimony. So is there a better way to do this? I mean, maybe this way, which we'll have to consider was error or not error, but wouldn't a better way be to bring in someone else who didn't participate in the investigation to interpret these coded communications from their expertise with the Mexican Mafia so the jury wouldn't get confused or to partition his lay testimony on certain days so that it wasn't intermingled with all the rest of the testimony? In theory, that's a possibility. With respect to this particular case, that solution or that approach would have been unworkable under the circumstances because there was so much evidence presented to this jury, and it was presented in the chronological fashion so they could follow through, and it was also presented to the jury in event specifics. So we went with the first homicide, then we went to drug trafficking, then we went to extortion, and then we presented evidence after the final homicide. And that was important because Judge Sobraw, before each one of those events, apprised the jury of which defendants those events would pertain to. So I know that one of the issues raised in the briefing, but not addressed here in oral argument, was the jury's ability to compartmentalize the evidence and evaluate the guilt or innocence of each defendant. And that was critical to the district courts ensuring that that took place in this particular case. So to have an expert, and to have an expert in this type of case, it's not where we can have a drug value expert where I've got 500 drug value experts and I can just pick up the phone and have somebody come down to court. This is a situation where we are in court every single day for a three- to four-month period, and to have the case agents available to testify in that fashion is really the only workable way to present that type of evidence. And I agree that if we had one day of expert testimony, the next day of non-expert testimony, and that would compartmentalize it even further. However, the steps that were taken in this case were the district court admonished the jury to evaluate the testimony separately, where the questioning of Agent Vitkoski was specifically parsed such that the jury was put on notice when he was rendering his expert opinion as opposed to precipitant witness testimony or lay opinion testimony. Those prophylactic rules are those set forth in the Freeman case, and there is nothing, absolutely nothing in the record to even suggest that the jury in this case somehow confused the dual role testimony of Agent Vitkoski. And a question was posed to Mr. Landon as to did the district court basically advocate its responsibility or did the defense attorneys just advocate their responsibility of asking for that type of instruction. I suggest to you respectfully that, yes, they did to the extent that they did not request it. But more importantly, in the Freeman court, they addressed the situation where one of the important components of making sure that no prejudice arises from this type of testimony is the effective cross-examination of the witness as the basis for their expert opinion. And that was done in this case. There was effective cross-examination of Agent Vitkoski, which challenged his testimony, both when it was given under 701 and it was given under 702. So I think that that component also exists in this particular case. So while the Freeman court recognized that there were inherent dangers, all of the parties in this case, to include the district court and the government in their questioning of Agent Vitkoski, abided by those concerns and did everything they could reasonably under the circumstances of this case to ensure that no prejudice resulted to the defendants in terms of the jury's ability to evaluate that type of testimony. The argument was made that while there were three instructions, there were 22 other occasions. That's playing a little fast and loose with the facts of this case, because on some days Agent Vitkoski testified more than once. So that sort of gives the court the impression that there were all these other occasions when he testified that the jury was not given this admonishment and that he testified in that dual role capacity on each and every time that he took the witness stand, which was simply not the case. So when he testified in his dual role capacity and that testimony was obvious to the district court, the district court gave the admonishment to the jury. The defendants have failed to present this court with any citation to the record whatsoever where he gave the dual purpose testimony and no admonishment was given. Quite frankly, I have not gone back through the record to make sure that that's the case, but the district court was very, very much aware of the inherent dangers, so to speak, as set forth in Freeman with this type of testimony and did what was necessary under the circumstances to ensure that those dangers would not infiltrate the fairness and integrity of this particular proceeding. There was a remark that Agent Vitkovsky, in his cross-examination, and he could be impeached with the fact that he had every interest in seeing a conviction. I would respectfully and very strongly disagree with that contention. The government proceeded in this case by presenting the evidence necessary to convince the jury beyond a reasonable doubt. There were no witnesses that the government called that had any self-interest in seeing that a conviction took place. The only premise upon which the evidence proceeded in this case and the prosecution proceeded in this case was to ensure that each and every one of these defendants had a fair and just trial. I think you misunderstand me. I think that, I mean, you know, obviously, as a district court judge, I suspect case agents all the time, and case agents get involved in their cases, and that's why we have the Freeman decision. They get involved in their cases, and they, I think it's a natural human tendency to want to see, when you've been investigating, your case comes to fruition. I don't see anything wrong with bringing that out, and I don't see anything wrong with someone having that attitude if you are participating in an investigation and a prosecution. I understand that that may typically be the case, but this prosecution, if the jury had come back at the end of the day and got not guilty verdicts as to each and every one of these defendants, the entire prosecution team would have walked away this case satisfied that we had done what we needed to do under the circumstances to present the evidence in this case. You would not have been gravely disappointed. I absolutely would have. Yes, of course. I certainly had a view of the evidence, and I did my best to be a point of laughter. I think you're going too far astray in order to address this point. Yes, Your Honor. Moving on to the proper report. The arguments made to this court that it was subject to discovery under Rule 16. The government's position is that is simply not the case. It is not subject to discovery under Rule 16A1 because it was not going to be used by the government during its case in chief or any presentation. By specific terms of that proffer, the government could not use it against Defendant Gonzalez-Gallegos in its presentation at trial. But it did use two statements from it, right? No. I thought it used a statement regarding Tupper Key and a statement regarding that, a statement regarding, I don't want to say anything that might be under seal, but. No, hopefully I can clarify it. There were two portions of that that were produced to the defendants. The portion that was produced by the government was that portion of the proffer statement that related directly to the murder of Alvaro Hernandez. And the reason why that was produced is because the government was discharging its Brady obligation in that during the proffer session, Defendant Gonzalez-Gallegos gave a theory as to why that homicide occurred that was materially inconsistent with the government's theory at trial. The government's theory at trial was that he was killed because he was taxing on behalf of the Mexican Mafia with no authority to do so. During his proffer statement, Gonzalez-Gallegos said it was a personal beast. It had something to do with facts and circumstances not related to the Mexican Mafia. And therefore, in discharge of our Brady obligation, we put that information out to defense counsel in a letter format. And that's significant because we can't put out a proffer statement because basically that would have been a green light for the Mexican Mafia to put a hit out on Defendant Gonzalez-Gallegos if he had met with government agents. So we provided that information, albeit not in the exact format in which it appeared, that is the FBI 302 report. And that was for concern over Gonzalez-Gallegos' safety. The second portion of that that was produced to the defendant was produced during the redirect examination of Agent Vitkoski during trial. And here's the way it proceeded. And I think my colleague, Mr. Lemesh, got it backwards a little bit.  He testified, he gave 702 testimony as to the meaning of drink a cup of tea. And not only in the line sheets that were produced to the defense, which gave the reasons why he had his expert opinion, that that meant that he had basically got what he was going to get. He was taxing on behalf of the Mexican Mafia with no authority to do so. And when Defendant Gonzalez-Gallegos talked to Codefendant Thomas Durkin in this intercepted call and said he drank his cup of tea, his expert opinion was, hey, we took care of him the way that we said we were going to take care of him. He's dead. And I'm expanding upon his expert testimony, but the gravamen of his testimony was that drink a cup of tea meant he was going to get what was due to him. And after vigorous cross-examination by Mr. Lemesh, Mr. Gonzalez-Gallegos' attorney, challenging that expert opinion, I asked for a sidebar with a district court judge. And the reason why that sidebar was requested is because the proffer letter itself provided that the government could use the information given during the proffer to impeach the defendant or a position taken by the defendant during trial proceedings. And I knew it was going to be a contentious issue because it was not something that had been produced in discovery, and that's why we went sidebar. And Judge Sobral said you can ask him the basis of his expert testimony, but you cannot specifically make reference to Mr. Gonzalez-Gallegos making that statement. And that's exactly what happened when Agent Gutkowski took the stand after that sidebar. So I disagree with the contention that the statements that were made were used against defendant Gonzalez-Gallegos. They formed the basis of the expert opinion, but we couldn't, as we were entitled to, go into the fact that not only consistent with his 702 expert opinion, the defendant himself interpreted the same conversation or the same set of words consistent with what he just testified to at trial. It was powerful redirect evidence that we did not go into. So the statement was never used against defendant Gonzalez-Gallegos as direct evidence, nor was it even brought before the jury that that was part of what formed Agent Gutkowski's expert opinion, that is that he had talked to Gonzalez-Gallegos. The jury was left with the impression that Agent Gutkowski had talked to a maid member of the Mexican mafia and four associates of the Mexican mafia who provided a definition of that term consistent with what he testified to at trial. And that was only on redirect examination after extensive cross-examination by counsel for Mr. Gonzalez-Gallegos. So those were the circumstances under which that limited portion, which was produced to defendants in court at the time that it was used, saw the light of day, if you will, during the trial proceedings. So that is it. Nothing else in that statement was ever alluded to or suggested to. And Mr. Lemesh was asked by the court about the proffer regarding his anticipated testimony and how it might have affected his decision-making. All of that proffer took place ex parte with the district court. So when he was asked whether or not the government said, your proffer is inconsistent with what's in this proffer report of your client, we had no basis to make that representation or threat, if you will, that we're going to use this proffer report against you. We reserved our right, as was the stipulated terms of the proffer, to use that down the road if appropriate, as we did on the redirect examination of Agent Gutkowski, where we were shut down by the district court and we didn't actually use that statement. So at no time was defendant Gonzales-Diagos threatened that we were going to use that to directly contradict any evidence he provided to the government because he provided no evidence to the government as to what any witnesses or even his client was going to testify to. And would you, if he had said, this is what I intend to offer, are you going to take the position that there's something in the proffer that contradicts it, you would have answered him? I would have. Other than to say that we reserved the right. No, I would have said, I have information from your client that's inconsistent with what that witness is going to testify to, and I would have sought to impeach that witness with those statements that were made by defendant Gonzales-Diagos. A proffer is not a free ride to come in and lie to the government. I understand that, but we're talking about a much more subtle problem of not disclosing it, and then a defendant saying, I want to put in defense X, and I'm prejudiced because I don't know whether the government is going to use the statement, whether I'm going to get sandbagged. What's their argument? And my question to you was, you've given a reasonable answer. You said, well, he gave this proffer X party, so I was never in a position to make a statement one way or the other, and I perfectly well understand that. And my question to you simply is, if you had been up at the sidebar or chambers, wherever that conversation took place, would you have said, if you do this, we have his proffer that contradicts it and we intend to use it? It never came to that, but I think given the way I would handle it right now, I would have said yes. I've got inconsistent information with what your proffer is going to be, and I intend to use that to impeach your witness, and I would have sought the district court's permission. So his X party statement is now part of the record, I assume. You've read it. Yes. It was not a focal point of my analysis. No, no, but was there anything in the proffer that would have contradicted that offer of proof? I can't say for sure, Your Honor. I apologize. It was not something that I focused my efforts on because I knew that it was basically water under the bridge at this point. The murder-specific information, again, was provided to the defendants pursuant to our Brady disclosure obligation. That is the theory of why the murder occurred. So the defense was on notice as to the general nature of what Mr. Gonzales-Gallegos said with respect to the motivation and the way in which the murder was committed because we disclosed that to the defense pursuant to our Brady obligation. Now, admittedly, the statement went into much more detail in terms of, you know, the Mexican mafia and his knowledge of the Mexican mafia and other facts and circumstances, which may have contradicted either his testimony at trial or defense witness. But for strategic reasons, they decided not to proceed down that path at trial, and therefore the issue really hasn't been preserved for this court because the statement was never used by the government and all we're left with is the tactical representation by defense counsel that I was afraid my witness might get impeached by some information out there that I didn't have access to, and therefore I decided not to call this witness, which brings me back to the Rule 16 analysis as to whether or not he was entitled to the information in the first instance. And he was not. It was not an interrogation? It was not an interrogation. Well, there are obviously, I mean, I've read it, and there are obviously portions of that 302 in which say that he was specifically asked questions. He was asked limited follow-up questions by Asian-Americans. And what was this? He just came in and he just started talking in the blue and nobody, I mean, it just seems hard for me to believe that in this proper session, aside from what was specifically in the 302, where he was actually questioned, that he just started talking without any kind of direction or questions. As Your Honor saw in the 302, there were five questions that were posed to him specifically. That's what the 302 says, but I can't believe that that was, that he, you know, he just walked into a proper session and started talking without any kind of direction, without any kind of question. He was focused in on illegal activities in which he was engaged. So he walked in, were you there? I was there. So he walked in and he just started talking, and near the end he was asked five questions? Yes, that is the manner in which I conduct almost all of my proper sessions, because I don't want to be, I don't want to have it suggested down the road that if I in fact used this witness, that somehow I tainted his testimony by suggesting to him what I wanted to hear or what subject areas I was particularly interested in. So a proper, under the circumstances under which I conduct them, is very much a one-way street, where the defendant is telling me information, and there may be follow-up questions that were asked, but that was particularly true in this instance, because the time in which Gonzales-Gallegos came in to give his proper statement, the RICO indictment had not yet been handed down. We still had all these defendants out on the street, and we did everything we could during that proper to make sure that we didn't tip our hand to Gonzales-Gallegos and let him know that we were taking a look at all of his criminal associates. So it was very much a one-way street. Ordinarily it's a one-way street, but under the unique set of circumstances in this case, it was very much a one-way street. Was there any kind of hearing in the district court at which this was explored? I mean, you're telling, I have no reason to doubt you, but was this explored in the record as to what actually happened, when questions were asked or not, or were we just to take your word, which is not really part of the record, it's really argument? Well, the record is such that the argument was made to the district court judge at the time that defense sought disclosure of the entire proper report. The district court specifically asked counsel for Gonzales-Gallegos, are you equating this proper session with an interrogation? And for reasons I can't explain, perhaps Mr. Lemesh can explain them to the court, he chose not to answer that question. So had he answered that question in the affirmative, or had he made some kind of argument to make that an issue that the court could have held a hearing on, then maybe the district court could have held a hearing. But again, it goes back to whether or not the district court abused its discretion. The district court made the proper inquiry of counsel for defendant Gonzales-Gallegos. The fact that he punted the issue and failed to address it speaks volumes as to whether or not the district court abused its discretion when it made the ruling the way it did, because he was asking the right questions. He was asking whether or not it was an interrogation, according to counsel for defendant Gonzales-Gallegos, and the question remained unanswered. Had he said it was an interrogation and my client's telling me that they were pummeling me with questions and that this was basically an in-your-face question-and-answer session where the government was trying to extract information, there may have been an issue for the district court to hold a hearing on. But as the record stands now, the district court asked a question and counsel for Gonzales-Gallegos failed to answer that particular question. So do you want to address the bargain continuance? Yes, I would. The trial date in this matter, this case went to trial in October of 2007. The trial date was set on October the 16th of 2006, and while it may be true that-and that's well over a year in advance- and the reason why the district court set that particular trial date is because of the exposure of these defendants, the likelihood that there were going to be numerous defendants who were going to proceed to trial in that plea agreements simply weren't applicable to this particular case, given the stakes involved and given the type of offenses involved, such that all counsel, all witnesses could be arranged, and everyone could block out a three- to four-month trial schedule in this particular case. And that's germane to the five-part analysis that the court must look to to see whether or not the district court abused its discretion when it failed to grant the continuance to Defendant Abarca. And critical to the court's inquiry is the argument that's being made that somehow the capital phase of this trumped trial preparation. They're one and the same. Of course there are additional facts and circumstances that were addressed during the mitigation submission to the United States Attorney's Office and ultimately to the Death Penalty Committee in Washington, D.C., on behalf of Defendant Abarca. But you don't proceed on a death penalty analysis in a vacuum. Of course the facts and circumstances surrounding this particular offense were evaluated by both his trial counsel and counsel that was appointed to assist. I don't dispute what you're saying, but I thought the argument is that most of the work in that regard, if not all, was done by death penalty counsel. And the judge refused the application of death penalty counsel to remain on the case after the government indicated it was not seeking the death penalty. And essentially that left the defendant to go to trial with a lawyer who had not done most of the work and said on the record that she was unprepared. It's very troubling here. It's almost as if he's basically ñ it's not a question of continuance or not a continuance. It's really a question of whether he's deprived of the right to the assistance of counsel. I agree that that would ñ I don't see this as the usual case in which a judge says, look, you've had plenty of time, you're weak. This is a case really of whether or not this defendant was denied the effective assistance of counsel by having to go to trial with a lawyer who was totally unprepared. Let's assume it was the lawyer's fault. We have to get into who's at fault here because everybody has an obligation to ensure that the defendant's constitutional right to the assistance of counsel is not violated. Isn't that the troubling part of this case? And then you have these ñ in the record she says, in the opening statement she says, one thing he killed was for personal reasons. Then the self-defense is withdrawn, self-defense is put back in. I find this really troubling, and I'm not sure that I agree with you that we're necessarily dealing with an abuse of discretion. You may be right. Under all the facts that you've said, it wouldn't be an abuse of discretion, except that what happened here is that this guy went to trial with a lawyer who was totally unprepared. That's the argument. And I appreciate the court concern in that regard. Of course, any time the adversarial system is not functioning at its highest level, it's a concern to everyone involved in the case. And when a defense counsel comes into court a week before trial and says, I'm not prepared, I can't provide effective representation to my client, it's a troubling fact that the district court had to grapple with under the circumstances. I know, and in part, I don't mean to be critical. As a district judge myself, I understand these problems, but it was almost self-created by not allowing most of the money had been paid to the lawyer who was most familiar and most prepared, that is the death penalty counsel. And if that lawyer had been permitted to remain in the case, this problem wouldn't have arisen. Now, I agree with you that it was, none of it was, a lot of it was the fault of this lawyer for taking a case and trying it two weeks before this case was scheduled, and there was plenty of notices to the time and all that. But the bottom line here is whether this, regardless of who was at fault, there's a serious question as to whether he was deprived of the effective assistance of counsel. I am troubled by some of the references on the record, as I'm sure the court is, that there was what appeared to be a waffling of the defense strategy up to the time of trial to include during trial with the withdrawal of the self-defense. But I respectfully submit that under the Strickland standard, the defendant was provided with constitutionally effective assistance of counsel. But I think the critical point here is that the defense did not revolve around any fact other than the defendant taking the stand and saying, I did this, but I did not do this on behalf of the Mexican Mafia. It is a classic credibility determination that the jury was asked to make as to whether or not they believe the testimony of this witness. Even if capital counsel had stayed on the case and had cross-examined, prison's a bad place. The suggestion was made that trial counsel could have cross-examined witnesses about how bad prison is and how bad the victim's reputation was and so forth and so on. But the fact of the matter remains that the defendant himself took the stand and said, I killed him. I stabbed him. The other person the government's evidence showed was involved was not involved, and I stabbed him for reasons other than the Mexican Mafia. He was then impeached on cross-examination. Didn't it ultimately turn on self-defense? It turned on whether or not it was a classic credibility determination. The entire case, from the defense perspective, turned on the fact whether or not the jury believed the testimony of the defendant. No, but was the defendant's testimony that he did it in self-defense? He said there was a drug debt that was unpaid, and they got into an altercation. The victim pulled out a small knife, and there was an altercation, and he wound up stabbing him as part of this mutual combat. So it was kind of a hybrid self-defense that he was attacked first. But then it wouldn't necessarily have been a good defense strategy to go into whether the person who he stabbed was a violent person or had a reputation for violence. Well, it was made clear to the jury that he was serving time for having killed one of his best friends. So the jury was not left unapprised of the victim's baggage, if you will. The jury was very much aware of the fact that the victim, who was stabbed to death over 100 times by defendants of Barca and Valenzuela, was not a good guy. He had, in fact, been prosecuted before for felony drug trafficking offenses in the Southern District of California. So the jury was not left with the impression that he was a blameless victim. But at the end of the day, once the defendant of Barca had testified, I stabbed him, but it had nothing to do with the Mexican Mafia. And this is a critical piece of evidence, because on cross-examination, the government introduced into evidence a letter written by defendant of Barca subsequent to the murder of Jabila Baragon at High Desert State Prison in 2002, where he was seeking Mexican Mafia authority to control a yard within the CDC, the California Department of Corrections. So when he took the stand and said, I have nothing to do with the Mexican Mafia, this had nothing to do with the Mexican Mafia, and then he was impeached with that significant evidence, at the end of the day, the jury was left with a classic credibility determination that all the preparation in the world by his counsel could not have overcome. It was the defendant's decision to take the stand, and may very well be the reason why the defense changed a little bit, whether it was self-defense, whether it was mutual combat, because the defendant probably couldn't make up his mind which lie he wanted to tell the jury. A defense counsel is stuck by what their client wants to say to a certain extent, and that appears to be the case in this instance, because the defendant made the decision to take the stand, exonerate one of his co-defendants, and take responsibility for having killed the victim in this particular case, and the jury was in the best position to make that credibility determination, and all the preparation in the world could not have changed their evaluation of his demeanor, when juxtaposed with all the other evidence in the case. And I would respectfully submit on that basis. All right. Thank you, counsel. Any of the defense lawyers feel that they have something they need to add at this point? I just have a brief comment. All right. Keep it brief. Those slides went by over time, so. I just want to hit three citations which were relevant to the dual use. Mr. Robinson cited to 876 through 79 and said that that had to do with Fitkowsky. My notes indicate that it had to do with Agent Flood and not Fitkowsky. He questioned whether or not there was reference in our materials to specific objections. At page 31 of my opening brief, there are nine cited objections to Fitkowsky. And there is within Mr. Durkin, Mr. Brannon's reply brief at page three, he cites to the record 191 and 192 where Agent Fitkowsky admits that he himself could not distinguish between being an expert and a lay witness. So I think all of those are important. There was one last thing that I just want to ask the panel, and that was there was an issue about the homicide book that had been, in effect, sent in an e-mail, questioned whether or not the court had received it. And I know Mr. Robinson had responded indicating that he was looking for something. I just wanted to make sure whether this was forwarded to the court because there are two. Yes, we have it. Okay, because there were, there's Mr. Robinson's copy, and then I subpoenaed to the court under an SDT, the San Diego Police Department, their homicide book in the case. They produced it. Judge Sobrat took it and reviewed it and sealed it and refused to turn it over to me. But it was given, I thought, to the Ninth Circuit. I thought that... Subpoenaed two separate homicide books. Exactly. They should have copies of it. Well, we can look into that. That's a question I have because I know that Mr. Robinson had his own, but... Couldn't they be the same? I don't know. I really don't know. All I know is that the San Diego Police Department did produce their homicide book in response to my subpoena, and Judge Sobrat sealed that. And then I thought, post-trial, he had ordered it to remain sealed and then ordered it to be sent to the Ninth Circuit. That's my recollection. And then I know in this latest email that Mr. Robinson was indicating he was going to send his copy of the homicide book to the court. That's what I thought. If I may speak to that issue. The homicide book was received by the defendants. The entirety of it was given to the court. The court then turned it over to the government for an in-camera submission. And the in-camera submission, much like the one that was sent to this court, detailed which cases had been produced to the defendants and which had not been produced to the defendants. And that was the book that was recreated at the request of the defendant at the court in which it was sent to the court. So it was really one and the same. It was the one that was subpoenaed versus the one that was subpoenaed to Judge Sobrat. So it went from Sobrat to the government to the Ninth Circuit? Yes. Okay. All right. Thank you. This case, 37 appeals, will be submitted, and this court shall terminate the session for today. Thank you. Thank you.
judges: Korman, Noonan, Wardlaw